## Hughes, et al. v. Busseyville Oil & Gas Company.

(Decided May 14, 1918.)

## Appeal from Lawrence Circuit Court.

1. Mines and Minerals—Oil Lease—Construction of.—Where a lease stipulated that it should continue for a period of two years and as long thereafter as the lessee produced oil in paying quantities, the digging of one well, within the two years, on the leased premises, that produced oil in paying quantities was a compliance with the lease-contract under the facts of this case.

2. Mines and Minerals—Oil Lease—Forfeiture.—Where there has been a failure on the part of a lessee of an oil lease to substantially perform the conditions of the lease, it may be forfeited.

3. Mines and Minerals—Oil Lease—Drainage of Oil From Leased Premises—Forfeiture.—Although a lessee of an oil lease complies with the terms of the lease by digging one well on the leased premises, if it appears that the lessee is draining the oil from the leased premises by wells sunk on adjacent lands, he may be compelled to sink other wells on the leased premises or submit to a forfeiture of the lease.

JOHN W. WOOD and A. O. CARTER for appellants.

W. B. O'NEAL and M. S. BURNS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

On the ............ day of May, 1911, the appellants, Hughes and wife, who were the owners of about 200 acres of land in Lawrence county, leased to the appellee, the Busseyville Oil & Gas Company, a corporation, the oil and gas properties in the land and the right to develop the same under a contract reading as follows:

"This indenture made this ............ day of May, 1911, by and between D. C. Hughes and Anna Hughes, his wife, of Busseyville, Lawrence county, Kentucky, parties of the first part, and the Busseyville Oil and Gas Company, a corporation organized, existing and doing business under and by virtue of the laws of the state of Kentucky, party of the second part, witnesses as follows: First: The said party of the first part in consideration of the sum of two shares of stock in the Busseyville Oil and Gas Company dollars in hand paid to them by the said party to the second part, the receipt of which is hereby acknowledged and upon the further consideration of the performance of the premises and covenants hereinafter made by the said party of the first part do hereby demise,

let and lease unto the said party of the second part its successors or assigns and upon the terms and for the time hereinafter set forth, the following premises, to-wit: All that certain tract or parcel of land situated lying and being in Busseyville voting precinct of Lawrence county, Kentucky, and same particularly bounded and described as follows, to-wit: On the north by the lands of John Wellman; on the east of the lands of F. R. Bussey; on the south by the lands of F. R. Bussey; on the west by the lands of Bettie Pigg and Lafe Wellman; containing two hundred acres more or less. Second: The time of said lease shall be for a period of two years from the date hereof and as long thereafter as the party of the second part, its successors or assigns, may produce oil and gas therefrom in paying quantities. Third: The lessee, its successors or assigns, is hereby given and granted during the continuance of said lease as long thereafter as oil and gas is produced therefrom in paying quantities, the sole and exclusive right to drill thereon for oil or gas, and store pipe and market the same as well as to build and operate thereover pipe lines for the transportation of oil and gas with free, uninterrupted and exclusive right to do any and everything upon and in said land necessary or proper to the complete execution and enjoyment of the purposes aforesaid together with the right to take from said premises free of charge to be used thereon, however, any stone water that may be necessary or convenient in the construction of its rights or the drilling of its wells. Fourth: The lessee, its successors or assigns, shall not however drill any well so as to unnecessarily interfere with the use, occupancy or enjoyment of any dwelling house, outhouse or barn now located upon the demised property. Fifth: The lessee, its successors or assigns, hereby accept the lease aforesaid and upon its part and in consideration of the grant to it of the premises aforesaid and upon the terms aforesaid hereby promises to and covenants with said parties of the first part, their heirs, personal representatives or assigns as follows, to-wit: The said party of the second part binds itself, its successors or assigns, to drill a well upon the demised premises through the big lime and big Indian and the Berea sands unless oil and gas be sooner found therein in paying quantities. Said well to be completed within two years from the date hereof, unless prevented by unavoidable accident or unless delayed by some defect in the title to said lands of lessors

and agree to drill a well on the O'Neal farm within five months. In the event gas should be found in paying quantities, the lessees, its successors or assigns, promise to pay to the lessors their heirs, personal representatives or assigns, two hundred ($200.00) per annum for every well so producing gas in paying quantities when and so long as the gas therefrom is marketed off the premises and in event oil should be found in paying quantities in any well drilled upon said premises, the lessee, its successors or assigns, hereby covenants to deliver the one-eighth (1/8) part thereof free of expense to the lessor and to the credit into any pipe line that may be constructed to, over and upon said premises, and will receive, purchase or transport said oil, but this covenant shall not bind the lessee, its successors or assigns, to construct any such pipe line or to deliver any oil from said well to any pipe line at a loss. Sixth: It is further mutually agreed by and between the parties hereto that the drilling of a well as hereinbefore provided upon said premises during the first year of said lease, whether the same produce oil or gas in paying quantities or not, shall operate a complete discharge of all rentals during the first two years of this lease, but the extension of this lease after the two years' term shall depend upon productions at the time and thereafter of oil and gas in paying quantities as hereinbefore provided. In the event, second party fails to perform the agreement herein, then this lease is void and canceled and held for naught."

Thereafter the Busseyville Oil & Gas Company subleased 40 acres of the land to the Wayne Oil Company, and this company within the two years finished digging one well on this 40 acres that produced sufficient oil to yield Hughes a royalty of about $180.00 per year. The Busseyville Oil & Gas Company did not attempt, through itself or lessees, any further development of the land and in March, 1914, Hughes brought this suit for the purpose of cancelling the lease to the Busseyville Oil & Gas Company, and also the lease made by it to the Wayne Oil Company, upon the ground that the Busseyville Oil & Gas Company had failed and refused to drill any other wells on the land, or attempt any further development of the oil and gas properties thereon, although it had frequently been requested so to do; that the Busseyville Oil & Gas Company and the Wayne Oil Company were insolvent, and the failure to further develop the land had and would work a great and ir-

reparable injury to the parties by depriving them of profits and income that they would receive if the land was developed in accordance with the terms of the lease contract; they further said that the directors and stockholders of the Busseyville Oil & Gas Company were the owners of lands adjacent to the leased premises and had put in producing wells on their lands that were draining the oil from this leased land.

For answer to this suit, the Busseyville Oil & Gas Company, after traversing the material averments of the petition, set up that the oil field covered by the lease and adjacent land was not profitable or productive territory; that it had a limited capital and could not expend any more money than it did in developing or having developed wells on the leased premises, but it would do so whenever its capital permitted and the development promised to be remunerative. It admitted that several producing wells on land adjacent to the leased land had been sunk but denied that these wells drained any oil from the leased land, the substance of this answer being that its financial condition and the limited prospects would not justify it in putting in any more wells on the leased land, and besides the well it had sunk was a compliance with its contract obligations.

The answer of the Wayne Oil Company set up that the well it sunk on the land leased by it from the Busseyville Oil & Gas Company cost about $4,000.00, and did not produce over three barrels of oil per day, and it would not pay to put any more wells on this leased land.

The Ohio Fuel Oil Company came into the case by an intervening petition, but afterwards, by an agreed order, the case was settled as between Hughes and the Wayne Oil Company and the Ohio Fuel Oil Company, and the right of the Wayne Oil Company to continue in possession of the 40 acres leased by it from the Busseyville Oil & Gas Company was confirmed so that the only question left in the case was the right of Hughes to have a cancelation of so much of the lease, or about 160 acres, as continued in the ownership of the Busseyville Oil & Gas Company.

Some evidence was taken by the parties in support of their respective contentions, and upon submission the lower court adjudged that the Busseyville Oil & Gas Company should pay to Hughes a rental of $100.00 a year until it drilled an additional well on the leased land, and that the drilling of an additional well should operate

as a discharge of its liability to pay the $100.00 a year. From this judgment Hughes prosecutes this appeal, insisting that there should have been a judgment canceling the lease as to all of the land not sub-leased to the Wayne Oil Company in place of the judgment not asked for, or justified by the pleadings, that was rendered by the lower court.

Under the admitted facts showing that only one well has been sunk on the leased premises, the case, as we look at it, must be determined upon a construction of the lease-contract between Hughes and the Busseyville Oil & Gas Company which contains conditions and stipulations not usually found in lease-contracts of this nature.

Turning, now, again to the lease we find it stipulated that "The time of said lease shall be for a period of two years from the date hereof and as long thereafter as the party of the second part, its successors or assigns may produce oil and gas therefrom in paying quantities. . . . The said party of the second part binds itself, its successors or assigns to drill a well upon the demised premises. . . . Said well to be completed within two years from the date hereof, unless prevented by unavoidable accidents. . . . But the extension of this lease, after the two year term, shall depend upon productions at the time and thereafter of oil and gas in paying quantities as hereinbefore provided. In the event second party fails to perform the agreement herein, then this lease is void."

It will be observed that under the conditions of this lease it was to continue in all events for a period of two years from the date thereof, provided one well was completed within two years, so that unless something operated to work a forfeiture after the expiration of the two years the oil and gas company could not be ousted from the use of its rights under the lease. Let us see now what it was to do after the two years. The lease provided, as we have seen, that its extension for longer than two years depended upon the production, at the expiration of two years and thereafter, of oil "in paying quantities as hereinbefore provided." The "hereinbefore provided" conditions stipulated that the lease should continue after the expiration of two years as long as the oil and gas company produced oil in paying quantities, and so the matter in issue comes down to this: Did the digging of one well and the production of oil from this well in paying quantities satisfy the condition in the lease that it should be extended beyond two years if

oil, at the expiration of two years and thereafter, was
produced in paying quantities?

It is conceded that the well sunk on the premises did,
at the expiration of two years and thereafter, produce
oil in paying quantities, and that Hughes receives royalty
therefrom amounting to about $180.00 a year, and this
being so we think that under the facts appearing in this
record Hughes is not entitled to a cancellation of the
lease.

It is, however, insisted by counsel for Hughes that
when the contract of lease was entered into it was within
the contemplation of the parties that the territory leased
should be fully developed so that Hughes might get the
full income that the complete development would pro-
duce, and it is said in this connection that a reasonable
development of the territory would require the sinking
of, probably, twenty or more wells; and further, that to
permit the oil and gas company to retain the rights and
privileges granted by the lease, indefinitely, upon the
sinking of one well, would work a great injustice to
Hughes and deprive him of income to which he was en-
titled and would receive if the intention of the contract
was carried out and the territory developed as it was
contemplated it should be. There would be much force
in this argument if the contract and the facts made out
a state of case that justified its application, but we are
of the opinion that the construction we have placed on
the contract will effectuate the intention that was in the
minds of the contracting parties when the lease-contract
was entered into. This territory had not before been de-
veloped nor was it known what productive value it had.
The Busseyville Company was a local concern with small
capital, but apparently willing to undertake the venture
and the risk involved under the terms of a special con-
tract that Hughes was willing to make in order to se-
cure some development and profit from his land. It
does not appear that either of the parties, at the time,
thought of putting down the probable number of wells
that it would take to fully test the oil qualities on the
property, as to do so would require the expenditure of a
much larger amount of money than the Busseyville Oil
& Gas Company had or could get, or desired to invest in
the enterprise.

It is true, as argued by counsel for Hughes, that it
has been the settled practice of this court to give to oil

and mineral leases, when the contract permitted us to do so, such a construction as would protect the rights of the landowner and enable him to derive from the lease the benefits he had the reasonable right to expect when it was entered into; thus we said in Monarch Oil, Gas & Coal Company v. Richardson, 124 Ky. 602, that: "Oil leases yield nothing to the landowner when not worked, and are an incumbrance on his land, preventing him from selling or leasing it to others, although it costs the lessee nothing except the mere pittance paid as rent. The development of mineral, oil, and gas lands is too expensive for the landowner himself to undertake, and requires skill and capital ordinarily beyond the reach of the owner of the soil. So that, in order that these resources may be developed and profit realized therefrom, it is necessary that the privileges be granted to persons who are engaged in the business of exploring and developing oil, gas, and mineral fields. The fluctuating and uncertain character and value of this class of property renders it necessary for the protection of the lessor that the properties leased should be developed as speedily as possible, and the lessee will not be permitted to hold the land for speculative or other purposes an unreasonable length of time for a mere nominal rent, when a royalty on the product is the chief object for the execution of the lease. It is true, as said by counsel for appellant, that forfeitures are not generally favored by the law, but forfeitures which arise in gas and oil leases by reason of the neglect of the lessee to develop or operate the leased premises are rather favored because of the peculiar character of the product to be produced. Hence it has been found necessary to guard the rights of the landowner as well as public interest by numerous covenants, some of the most stringent kind, to prevent their land from being burdened by unexecuted and profitless leases incompatible with the rights of alienation and the use of the land. Forfeiture for non-development or delay is essential to private and public interest in relation to the use and alienation of property. Perhaps in no other business is prompt performance of contracts so essential to the rights of the parties, or delay by one party likely to prove so injurious to the other." To the same effect are Soper v. King, 167 Ky. 121; Dinsmoor v. Combs, 177 Ky. 740. But in those cases the lessee, with-

out attempting any development, was holding the leased premises apparently for speculative purposes.

But it can not be said that the Busseyville Oil & Gas Company is holding this leased land for speculative purposes and without any intention, in the immediate future, of developing it to the extent it may be profitable to do so. It is shown in the evidence that it costs about $4,000.00 to dig a well and that, although a number of wells have been sunk in the territory adjacent to the Hughes land, the average production of the wells is only about two barrels a day, and that it would not be profitable to put on the Hughes land, at least at this time, any other wells.

It also appears from the record that the Busseyville Oil & Gas Company or persons acting under or for it or connected with it as officers have sunk on lands adjoining this Hughes land about thirteen wells, each producing, as we have said, an average of about two barrels of oil a day, and it is pressed upon our attention by Hughes that the oil and gas company has failed and refused to sink any more wells on his land in order that it might drain the oil from his land through the wells sunk on the adjacent land, and if the record furnished any support for this contention, we would be disposed to afford Hughes such relief as would prevent the oil and gas company and its owners and promoters or lessees from exhausting, in the manner suggested, the oil from the land of Hughes. The evidence, however, shows that the wells that have been sunk on land adjacent to or in the neighborhood of the Hughes land do not take any oil from the Hughes land, and, therefore, it cannot be said that Hughes has suffered any injury by the sinking of these wells on the adjacent land.

We do not, however, mean by what has been said in this opinion to foreclose the right of Hughes to hereafter take such appropriate action as may be necessary to prevent the oil that may be on his land from being drained or taken therefrom by wells that are now or may hereafter be sunk on adjacent lands, and if it, hereafter, be made to appear that the Busseyville Oil & Gas Company, or its officers or stockholders or successors in title, or by lease, are operating wells on adjacent territory to the Hughes land, that will probably drain or take the oil from his land, the Busseyville Oil & Gas Company may be compelled to so develop the Hughes land as to

prevent the loss to Hughes that would follow if it, or
persons connected with it, or holding under it, were per-
mitted to exhaust or drain oil from his land, for, although
we have held on the facts of this record that one well
is a performance of the conditions in the lease, it would
be a manifest injustice to Hughes if the Busseyville Oil
& Gas Company were permitted to stand upon the terms
of its contract and at the same time destroy the life and
substance of it by permanently taking from Hughes in-
come that he had the right to the enjoyment of.

The judgment is affirmed.