## Lacer, et al. v. Sumpter.

(Decided April 24, 1923.)

### Appeal from Warren Circuit Court.

1. Mines and Minerals—Installation of Pumping Machinery to Determine Whether to Continue Drilling is not "Development."—In the absence of proof that the word "development" had been given a technical meaning in the oil industry, a provision of the lease requiring the lessee to continue development of the property must be construed as a continuation of the work in hand, in a manner that would discover oil, if it existed, and promote its production, and the installation of pumping machinery merely for the purpose of determining whether or not the lessees would continue

drilling would not be a development, although the installation 'of such machinery to ascertain the production of a well and to market the product might fall within the meaning of the term.

2. Mines and Minerals—Parties Held to Have Construed Installation of Pumping Machinery as Completion of Well and Development.— Proof that the lessees, under a lease which provided that if a dry well was struck and the lessees failed to continue development the lease should terminate, drilled a well which proved to be dry, but thereafter installed, in another previously drilled on the premises, which they claimed was producing well, machinery for pumping the well, and tanks in which to store the oil pumped, of which installation the lessor had knowledge, and in which he assisted, shows that the parties construed the installation of the pumping machinery as the completion of the well and as development within the lease.

3. Mines and Minerals—Development by Completion of First Well Held not to Release Obligation of Lessee to Drill Other Wells.— Development under an oil lease, by completion of a first well, does not release the obligation of the lessee to drill other wells as required by the lease, even if the first well develops into a paying well, and a fortiori does not have that effect if the completed well was non-producing.

SIMS, RODES & SIMS and JOSEPH E. CONKLING for appellants.

WRIGHT & McELROY for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

On the first day of May, 1919, Joe B. Sumpter and his wife executed to J. B. Sumpter and D. W. Wright an oil and gas lease on an 80-acre tract of land in Warren county. By its terms the lessees were given the right to drill for oil and gas, the lease to remain in force for one year and so long thereafter as oil and gas, or either, was produced. The only rental to be paid was a royalty of 1/8 of the production, it being provided that unless an oil well was drilled and completed in ninety days from date of contract the lease should be void.

At that time the oil fields of Warren county were undeveloped. Wright and Sumpter were not oil operators but were landowners, who in this way secured a number of leases in hope of assigning the block to some one who would drill for oil. Later, about the middle of May they did assign all of same to Mrs. N. T. White and Mrs. Harry Gray. These parties began drilling on the Sumpter lease in July and about the middle of August brought in

what was considered a dry hole, which was abandoned by them. Nothing further was done until April, 1920. Dr. S. O. Lacer and F. H. Scott, who had been connected with the former drilling, took the assignment from the ladies and secured an extension of the Sumpter lease. By the terms of this agreement they deposited $4,000.00 in escrow in a local bank and agreed to complete the old well and drill another at least 1,100 feet deep, more or less, and providing, "that in case a dry well may be struck and the parties fail to continue development within sixty days after drilling the dry hole, then the lease shall be void." On Sumpter's part it was agreed to extend the time of drilling the well to June 1st, 1920.

Lacer and his associates began drilling, and on the 14th of July, 1920, brought in another dry well at a depth of 1,005 feet. They did no other drilling either on the first well or a new one.

On the 7th of September Sumpter executed in writing and delivered to them another paper extending the time from September 12 to October 12, this being on the theory that no development had transpired subsequent to July 14, that by its terms the lease would expire on September 12th.

About September 7th, Lacer understook to case and pump the first well, and during the month of September was engaged in doing this. He did place in tubing, brought down a pump and erected a hundred barrel tank and did some pumping. There is evidence to the effect that Sumpter knew of this and assisted materially in securing tankage and the pump, but he denies that this was understood or accepted to be in lieu of drilling.

On October 12th, Sumpter and his wife executed another tentative lease extending the time for three months, on condition that additional wells were drilled and voiding the lease unless that was done. Dr. Lacer took this paper to his company and upon consideration it refused to accept it and returned same to Sumpter. It is also claimed that it refused to accept the extension granted by Sumpter on September 7th, both refusals being predicated on the assumption that it had complied with its contract, and that the lease could not be terminated. Thereupon, on November 11, Sumpter gave notice and brought suit in the Warren circuit court for the cancellation of the lease. Issue was joined on the pleadings and the chancellor awarded him the relief sought. Lacer, et al., appeal.

The appellants contend that the first well was really a producer; that with the knowledge, acquiescence and assistance of the appellee they went to the expense of something near $3,000.00 to install the pump and tankage and place tubing in the well, and in testing it on two different occasions did produce as much as five barrels of oil at a time. They did not claim this as to the second well. It did not show oil when drilled and on an attempt to test it afterwards found it obstructed at a depth of 635 feet; that it would require drilling to remove this obstruction, but they believe that if this was done and duplicate pumps put in both wells and operated by the same engine, that both would show production. They further claim that they were delayed in securing funds during the fall of 1920 by reason of the Kentucky blue sky laws, and had only secured permission from the state banking commissioner to sell their stock a few days before this suit was brought; that they could not anticipate its termination and therefore did nothing further.

So far as we are advised the word "development" has not been given a technical meaning in the oil industry. Evidently by its use the parties contemplated a continuation of the work in hand in a manner that would discover oil if it existed, and promote its production.

If the lessees installed the pumping machinery merely for the purpose of determining whether or not they would continue drilling, such test would not in our opinion be a development in the meaning of the contract. On the other hand, a flowing well would be of but little profit unless its product could be marketed. To install such machinery would afford means of ascertaining its production and of marketing the product and might fall within the meaning of the term.

To our minds the pumping test taken, together with the other evidence, is conclusive that well number one is not a producing well, as that term is used in this state, but we have seen that the contract called for the completion of this well, and the actions of Mr. Sumpter in assisting in the matter, and in encouraging appellants to spend $3,000.00, are to be construed as accepting the installation of the pumping machinery as such "completion," and by a parity of reasoning it would follow that such completion of that well would constitute a "development" in the meaning of the contract. This does not mean that such development would release the appellants from the obligation to do further drilling; that would not have been

the case even if number one had developed into a paying well. Hughes v. Busseyville Oil & Gas Co., 180 Ky. 545.

*A fortiori,* since it has not developed into a paying proposition, such action does not have that effect. But in view of the apparent good faith of all the parties, of the fact that appellants were continuing to spend large sums of money upon the property with the acquiescence and approval of the appellee, and the apparent construction given the contract by the parties as above set out, we feel that such development would continue the life of the lease while it was in progress, and that it gave the appellant sixty days longer in which to begin further drilling operations after the installation of the pump on October 12, 1920.

Judgment reversed for proceedings consistent with this opinion.