# Kentucky Coke Company, Incorporated, et al. v. Smith, et al.

(Decided February 24, 1925.)

## Appeal from Ohio Circuit Court.

1. Mines and Minerals—Coal Lease could Not be Canceled for Lessee's Failure to Develop Without Notice of Intention to Cancel Lease.—Lessors were not entitled to forfeiture or cancellation of coal lease for failure of lessee to develop land with reasonable diligence, where no notice of intention to cancel lease upon such ground was given lessee.

2. Mines and Minerals—Lessors Held Entitled to Terminate Coal Lease Because of Abandonment by Lessee.—Where only consideration for unilateral coal lease was development of land and payment of royalties, lessee's abandonment of operations on land for period of 20 years entitled lessors to terminate lease, though lessee had been operating coal mine on adjoining lands, and had spent large sums for equipment.

3. Mines and Minerals—Coal Lease Held Unenforceable Because Unilateral.—Where only consideration for coal lease for so long as desired by lessee was lessee's development of land and payment of royalties to lessor's the lease was unilateral and unenforceable in equity.

4. Mines and Minerals—Long Term Lease Contracts Not Providing for Development are Contrary to Public Policy.— It is contrary to public policy to allow mineral lands, in development of which general public is interested, to be hampered by long term lease contracts under which no development is had.

A. D. KIRK, CLARENCE BARTLETT, MATT O'DOHERTY and E. WOODWARD for appellants.

BARNES & SMITH for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

On the 12th of May, 1885, the widow and heirs of John H. Smith, deceased, of Ohio county, executed and delivered to McHenry Rockport Coal Company, a Kentucky corporation, predecessor in title of appellant, Kentucky Coke Company, Incorporated, etc., a lease on the coal in and under a tract of 210 acres of land, formerly owned by John H. Smith, whereby the corporation was granted the privilege of mining and removing the coal on a royalty basis of three (3c) cents per ton for certain of the coal, the balance to be free, "for a term of years as long as may be desired by the party of the second part,

or their assigns who are authorized to surrender up to the parties of the first part at any time by giving them a reasonable notice.'' Omitting the names of the parties, the description and concluding paragraph, the lease is in these words:

"WITNESSETH: That for and in consideration of a lease bond and agreement made by John H. Smith in his life and the further consideration as hereinafter expressed, the parties of the first part have leased and by these presents do lease, transfer and convey to the party of the second part, for a term of years as long as may be desired by the party of the second part, or their assigns who are authorized to surrender up to the parties of the first part at any time by giving them a reasonable notice, the coal which may be under a tract of land conveyed by A. W. Hunter to John H. Smith by deed recorded in book 'N,' page 65, in the Ohio county court clerk's office, and bounded as follows.

"The party of the second part are to have the timber on said tract which is on that part of the land lying south of the Cromwell and Rockport road, to be used in mining and working the mines at the shaft through which the coal is taken from the land hereby leased, and are to have the right to sink any water or air shaft on said land or erect any building that may be necessary for pumping the same and shall have the right of way under the ground to run out any coal which they may mine on any adjacent tract of land which they now own or purchase. The party of the second part shall have the right to sell and transfer this lease and all their rights and privileges under the same to any person or corporation whatever, and in case of such sale and transfer the parties of the first part are to look to the vendee of the party of the second part for all royalty that may become due after such sale and transfer. The parties of the second part or their assigns are to pay to the parties of the first part or their heirs or assigns royalty as follows:

"Three cents for every ton of merchantable coal taken from said land. Slack, but coal and coal taken from openings and entries to be excluded from payment of royalty. And said royalty is to be paid for monthly, that is, coal taken out one month is due and

payable at the end of the succeeding month, and it is agreed according to the wish of John H. Smith that all royalty is to be paid to Isabelle Smith, his widow, during her lifetime and then to be paid to the heirs of said John H. Smith or their assigns.''

Some time after the execution of the lease contract the lessor entered upon the premises and began to take out coal from a shaft theretofore opened by John H. Smith, owner. The work was prosecuted with more or less diligence through a number of years, during which time several acres of coal from the number 9 seam were removed. Work ceased some time about the year 1900, and the predecessors in title of the appellant, Kentucky Coke Company, moved all of its tools and machinery away and have since been operating a shaft on the Vaughn lands, which adjoin that of appellees. According to the record no coal has been removed from the Smith lease since about the year 1900. This suit was commenced in 1922 by the heirs of John H. Smith for a cancellation of the lease contract. The judgment followed the prayer of the petition and cancelled, set aside and held for naught the above copied contract, and it is from that judgment this appeal is prosecuted.

Appellants, Kentucky Coke Company, &c., incorporated, and the Louisville Gas & Electric Company, incorporated, insist the judgment should be reversed because the contract was a perpetual lease, if not an absolute grant, and further that appellees, John H. Smith, etc., made no demand for development of the coal property, and no notice of an intention to forfeit or seek cancellation of the lease contract was given before the commencement of this action, and, therefore, appellant had no right to institute or maintain this suit. This last contention is based upon our rule announced in oil and gas cases to the effect that a cancellation of a lease cannot be had for failure to develop, where the rentals are paid and other conditions complied with, until the lessor notifies ''the lessee that he will no longer accept the annual rentals or permit his land to remain idle and undeveloped but will require the lessee to execute the contract according to the intention of the parties by beginning its development in good faith, and if, after such notice and demand, the lessee does not begin the development within a reasonable time the lessor may have the lease

forfeited.'' Warren Oil & Gas Co. v. Gilliam, 182 Ky. 807; Monarch Oil & Gas Co. v. Richardson, 124 Ky. 602. This rule has been adhered to in many recent cases, including Hughes v. Parsons, 183 Ky. 584; Bertram Developing Company v. Tucker, 191 Ky. 9; Maverick Oil & Gas Co. v. Howell, 193 Ky. 433; Young v. Thompson, 194 Ky. 192; Bradshaw v. Hurt, 198 Ky. 38; Lacer v. Sumpter, 198 Ky. 752; Black, Rescission and Cancellation, vol. 2, secs. 568, 569; 9 C. J., 1207.

There is but slight evidence in the record which could be considered as tending to prove that the Smith heirs gave to the appellant company, or its predecessors in title, notice of the lessors' intention to cancel the lease if development was not prosecuted with reasonable diligence. It is true, J. S. Smith testified he spoke to some of the officials of the various companies, predecessors in title of appellant, holding the lease, concerning the same, but he nowhere says he demanded development or insisted upon the mining of coal and the payment of royalties in accordance with the terms of the contract. His evidence rather tends to prove he was trying to negotiate a sale of the property to the lease holding companies. It may be said with reasonable certainty that there was no notice or demand from the lessors to the lessees for prosecution of the work of mining and removing the coal from the leased premises. It follows, therefore, the Smith heirs were not entitled to a forfeiture or cancellation of the lease contract under the rule recognized in the case of Warren Oil & Gas Company v. Gilliam, *supra*.

But were they entitled to a cancellation on the ground of abandonment? It is admitted by appellant companies that no coal had been removed from the Smith shaft or for that matter from any of the land of the Smith heirs for more than twenty years next before the commencement of this action; but appellants insist that they were mining coal from other lands nearby which constituted a part of their large general holdings in that vicinity, and that they expected some time in the future to take the coal from the Smith lease or to transfer the lease to others who would do so; and in pursuance of their general plan, had, at a great expense, installed new machiney and equipment on adjoining lands for the purpose of mining and removing coal and that appellees by failing to demand prosecution of the work of removing the coal from the Smith lease acquiesced in appellants' failure to mine such coal and are now estopped to demand a

cancellation of the lease for want of development. Appellants also insist as there is no forfeiture clause in the lease contract no forfeiture can be had, for the circumstances, they insist, are not such as to warrant a forfeiture. They further say that the Smith heirs are estopped both by the statutes of limitation and by laches to demand a cancellation of the lease.

It will be observed from a reading of the lease contract copied above that there was no cash or other immediate consideration whatever paid by the lessee to the lessor at the time of the making of the contract in 1885. The grant was in consideration of the development of the property and the payment of royalties upon coal mined. The lessee did not agree to do anything, not even to develop the property or to mine the coal. It only undertook, in case it mined coal from the premises, to pay the insignificant sum of three (3c) cents per ton for merchantable coal taken from the lands, but all slack, nut coal and coal taken from openings and entries, was to be free of royalty. The lessee also was granted timber from the land with which to work the mines. To make itself absolutely secure against liability the company in the preparation of its lease, added this clause:

> "The party of the second part shall have the right to sell and transfer this lease and all rights and privileges under the same to any person or corporation whatsoever, and in case of such sale and transfer the parties of the first part are to look to the vendee of the party of the second part for all royalty that may become due after such sale and transfer."

The lease, as stated above, was for an indefinite number of years, "as long as may be desired by the party of the second part or their assigns, who are authorized to surrender up to the parties of the first part at any time by giving them reasonable notice." This clause rendered the contract unilateral and wholly unenforceable in equity. Without consideration the lessee was granted the privilege of mining the coal or not at its pleasure, through an unnumbered period of years, with the privilege, exclusive to it, of terminating the lease at any time at its pleasure without payment of consideration. All the authorities hold such a contract unilateral. We so held in the cases of Berry v. Frisbie, 120 Ky. 337; Litz v. Goosling, 93 Ky. 185; Eastern Ky. Timber Co. v.

Swann-Day Lumber Co., 148 Ky. 82, and other cases there cited.

In Killebrew v. Murray, 151 Ky. 345, when speaking of a contract similar to the one under consideration, we said: "Such contracts lack the mutuality essential to their validity. A unilateral executory contract is in law a *nundum pactum,* and is unenforceable. Where it is left to one of the parties to an agreement to choose whether he will proceed or abandon it, neither can specifically enforce it in equity."

This was an executory contract. True, the predecessors in title of appellants mined coal under the lease, but they ceased to do so more than twenty years before the commencement of this action. While they were taking out the coal the contract was being executed from day to day, but when they ceased to take coal, leaving it in the ground unmined, the contract was executory as to that part unfulfilled. The consideration, as stated above, was the mining of the coal and the payment of royalties on coal mined. When the mining ceased, the consideration ceased, and either party was, under the terms of this lease, entitled to abandon it at pleasure, because it was not enforceable against either. The mere fact that appellants had been operating a coal mine on adjoining lands, and have recently spent large sums for equipment on such lands as a part of a plan for taking coal from other lands, gave no right to a continuation of the lease on the Smith lands on which they had ceased to operate more than twenty years before.

It is also insisted by appellants that they have recently come into ownership and possession of the mine, having purchased the same in 1918, and that between the time of their purchase and the commencement of this action in 1922, they had not sufficient time, owing to misfortunes over which they had no control, including a destructive fire, in which to clean out the mine on the Smith place or to open new entries leading to the coal on the Smith lands, and for this reason the lease contract should not be canceled. This argument is not convincing. It was no benefit whatever to the Smith property for appellants to operate coal upon adjoining lands. The only benefit moving to appellees from appellants was a payment of the royalties, and this had been withheld for more than twenty years. The shaft, entries and rooms in the Smith mine had been allowed to fill with water and all improvements to fall into decay and ruin. Twenty years' disuse

has rendered the shaft, entries, and other improvements practically valueless. One witness stated that the entries and rooms in the mine, which was about eighty feet below the surface, were filled with water to the roof; that the water was about a mile or a mile and a half long and from 100 to 800 feet wide; that all this water would have to be removed from the mine before it could be operated, which is a big undertaking.

The rule with respect to cessure of work after operations begun is much the same with respect to coal leases as with oil and gas leases. "Cessure of work will operate as a termination of a lease by abandonment, especially where the first or second well proves to be a dry one. Thus where a lease was for fifteen years, and as much longer as oil or gas is found in paying quantities; and the lessee erected a 'rig,' drilled a test well, but obtained no oil, and thereupon removed the machinery used in drilling, leaving nothing but a wooden tank, which rotted, asserting no title to the premises for nine years," it was held that the lease had been abandoned, says Thornton in his work on Oil and Gas, page 262.

Equity will not allow the holder of a lease contract to continue it in force although neglecting to develop the property or remove the mineral when the total consideration for the granting of the lease was the removal of the mineral, and the payment of royalties, after a reasonable time has elapsed for the commencement or continuation of work of development or production. It is against the well established public policy of this Commonwealth to allow mineral lands, in the development of which the general public is interested, to be hampered by long term lease contracts under which no development is had. The consideration of the great inequities which appellants were attempting to enforce against appellees induced the chancellor, no doubt, to enter a decree cancelling the lease contract. In this we concur.

Judgment affirmed.