## Park et al. v. Young et al.

(Decided Nov. 19, 1935.)

368

BARNES & SMITH for appellants.

E. B. ANDERSON and SIDNEY B. NEAL for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

On November 4, 1927, the appellants, J. C. Park and his wife, Elsie Park, executed and delivered to R. P. Rowe an oil and gas lease on a tract of land in Daviess county containing 76 acres. Rowe sold an interest in the lease to L. C. Young, Paul Goldberg, and Sidney B. Neal. It appears that Young later acquired the interests of his associates and is now the sole owner. Two producing oil wells have been drilled on the land, and one gas well which has been abandoned. On March 24, 1930, J. C. Park and Elsie Park brought this action to have the undeveloped portion of the lease canceled, and to recover damages in the sum of $20,100. They alleged in substance in their petition that the lessees drilled two wells on the land in 1928, and found oil in paying quantities in the Jones sand at a depth of approximately 925 feet, and that oil had been produced and marketed from these wells in commercial quantities since their completion; but that notwithstanding this fact, and the further fact that oil in paying quantities had been discovered on adjacent lands, the lessees had failed and

refused since July, 1929, to explore further for oil on plaintiffs' land and to develop the leasehold in accordance with the lease contract. They further alleged that in May, 1929, the lessees drilled a well to offset a producing well on an adjoining tract of land owned by J. L. Park, and at a depth of 931 feet the Jones sand saturated with oil was penetrated; but they failed to produce oil from this sand and instead drilled several hundred feet deeper and converted the well into a gas well which was later abandoned. They alleged they had been damaged in the sum of $5,000 on account of the failure of the lessees to develop the well into a producing oil well. Damages in the further sum of $5,000 were sought, which they alleged resulted from the negligence of the lessees in permitting water to enter the oil-bearing sand under plaintiffs' land when the oil well was abandoned. They also alleged that the lessees, by their failure to develop the leasehold in a reasonable manner, had permitted oil and gas to be drained from plaintiffs' lands into wells on adjoining lands and that they had been thereby damaged in the sum of $10,000.

The lease contract provided that the lessees should pay to the lessors the sum of $100 annually for each gas well from which gas was marketed off the premises, and the petition alleged that the lessees had been using gas from the gas well since June, 1929, and failed to pay to the plaintiffs the sum of $100 as provided in the contract. The issues were completed and a large amount of evidence was heard. It was admitted that gas from the gas well had been used off the premises, and that the sum of $100 was due to the plaintiffs under the contract. The court entered a judgment for $100 in favor of the plaintiffs, but declined to cancel the lease or award them any damages, and the plaintiffs have appealed.

The questions presented are wholly questions of fact. The evidence shows that the oil pool underlying the J. C. Park land is found in the Jones sand at an approximate depth of 925 feet, and is only a few hundred feet in width. A large number of wells have been drilled into the Jones sand, but many of them were dry holes and no large producing wells were discovered. The J. C. Park tract of land is rectangular in shape and is about 600 feet in width. No paying wells have been found immediately east or north of his land. H. A. Sal-

mon owns a tract of land adjoining J. C. Park on the west on which are two small producing wells, but they are located several hundred feet west of Park's line. R. F. Sands owns a 40-acre tract of land adjoining J. C. Park on the west, and there are four producing oil wells on this tract, but none of them is near J. C. Park's line. J. L. Park owns 100 acres of land which lies south of the R. F. Sands 40-acre tract, and adjoins J. C. Park's land on the west. There are seven producing oil wells on this tract, and well No. 1, drilled in December, 1927, is 120 feet west of J. C. Park's west line, and well No. 5, drilled in June, 1929, is 250 feet west of J. C. Park's line. Harry Simmons owns a tract of land adjoining J. C. Park on the south, on which there are two producing wells; and R. F. Sands owns a tract of 155 acres adjoining J. C. Park on the east and south, on which one dry well and four producing wells have been drilled. Well No. 2 on this tract is dry, and is 120 feet east of J. C. Park's east line. Wells Nos. 1, 3, 4, and 5 are small producers and are southeast of J. C. Park's land.

In May, 1928, the appellees drilled a well on the J. C. Park lease, 120 feet east of the east line of R. F. Sands' 40-acre tract and 120 feet north of the J. L. Park 100-acre tract. This well had an initial production of five barrels of oil daily. In October, 1928, they drilled a well in the southeast corner of the J. C. Park 76-acre tract, which was an offset well to a well on the Harry Simmons tract on the south and to wells Nos. 1 and 2 on the R. F. Sands 155-acre tract on the south and east. This well also had an initial production of five barrels daily, but the two wells soon settled down to a daily production of slightly more than one barrel each. In May, 1929, appellees drilled a well on the J. C. Park tract of land as an offset to well No. 1 on the J. L. Park 100-acre tract, which adjoins the J. C. Park tract on the west. This well was 120 feet east of J. L. Park's east line, and when the Jones sand was penetrated a showing of oil was discovered. The lessees concluded, however, that the showing of oil was not sufficient to warrant shooting the well, and they continued drilling until the Jackson sand was penetrated at a depth of approximately 1,200 feet. Gas was discovered in the Jackson sand, and the well had an initial flow of 500,000 cubic feet daily. It was equipped as a gas well, and the gas was piped to adjacent lands and used by appellees in

operating their drilling machinery. The flow of gas soon decreased to 50,000 or 60,000 cubic feet daily, and the well was abandoned. The casing was pulled, and the hole was filled with drill cuttings to prevent water from entering the oil-bearing sands. It is contended by appellants that the lessees at least should have drilled a well in the southwest corner of their land as an offset to the producing oil wells on the J. L. Park 100-acre tract adjoining it on the west.

A number of witnesses were introduced on both sides, and there is a conflict in the evidence as to the probability of discovering a paying oil well in the Jones sand at this location. The great preponderance of the evidence, however, particularly of men experienced in the oil business, is that the presence of oil in paying quantities at the point suggested is improbable. L. C. Young testified that he had expended $11,500 in drilling the three wells on the J. C. Park land, and at the time he testified had recovered from the two producing wells $2,600. It was improbable that these wells would pay the cost of drilling.

The lessee under an oil lease must develop the property in good faith and with reasonable diligence, and if oil is discovered in paying quantities, or it reasonably appears to be present in paying quantities, he must proceed with the development so as to obtain full production in order that the lessor may receive his royalty. Wills' Thornton on Oil and Gas, sec. 503; Flanigan v. Stern, 204 Ky. 814, 265 S. W. 324; Lawrence Oil Corporation v. Metcalfe, 241 Ky. 353, 43 S. W. (2d) 986. In Warfield Natural Gas Co. v. Allen, 248 Ky. 646, 59 S. W. (2d) 534, 536, 91 A. L. R. 890, it was said:

"The reasonableness of the diligence and course of conduct with respect to the extent of the prosecutions of the operations is to be measured by what would be done under the same or similar circumstances by operators of ordinary prudence and diligence having regard for the common rights and mutual advantages of both parties to the contract and not of the lessee or operator alone. * * * Where it is a question of fact as to whether oil has been found in paying quantities, or whether the productiveness of the property is sufficient to justify further development or operations after discovery of

oil, the discretion and judgment of the lessee will be accepted as conclusive unless fraud or bad faith is shown. * * * The idea which has ruled the courts seems to be that, if the matter is one of judgment —to do or not to do—as between the man who must hazard his money and the man who has much to gain and little or nothing to lose, the former's judgment should be accepted unless it be shown that his choice was made or action taken arbitrarily, in bad faith or to defraud the lessor.''

As pointed out by a number of appellees' witnesses who were experienced in the oil drilling business, the well which it is suggested should be drilled in the southwest corner of the J. C. Park tract of land would be, if located a proper distance from the east line of J. L. Park's 100-acre tract, within 200 feet of well No. 2 on the J. C. Park tract which has a settled production of slightly more than one barrel daily and is not a commercially profiitable well, and would be a like distance from well No. 3 on the same tract which was a nonproducer. It is claimed that the producing wells on the J. L. Park tract are draining the oil from the lands of appellants, but the closest well is 250 feet west of their west line, and according to the great weight of the evidence little oil would be drained from their lands through this well because of the character of the oil-bearing sand. The sand is hard and close, and lacks porosity.

Considerable proof was heard on the question as to whether or not the lessees were negligent in the methods employed to close well No. 3 when it was abandoned, thereby permitting water to enter the oil-bearing sands. The chancellor's finding on this question is supported by the weight of the evidence. A number of experienced oil drillers testified that when the casing is pulled and the well is abandoned, the proper method to close the well in order to prevent water from entering the oil-bearing sands is to fill the hole with drill cuttings. The method employed by the lessees was that employed by careful and experienced oil drillers.

If an oil and gas lease contains no special covenant for the protection of the leased land from drainage by wells drilled upon adjoining land, such a covenant will be implied and the lessee will be required to protect the land leased from drainage by the drilling of such off-

set wells as may be reasonably necessary to accomplish that purpose. Hughes v. Busseyville Oil & Gas Co., 180 Ky. 545, 203 S. W. 515; Union Gas & Oil Co. v. Diles, 200 Ky. 188, 254 S. W. 205. Before the lessor, however, can compel the lessee to drill offset wells, he must show conditions indicating that drainage is actually taking place and that it is substantial in amount. If the drainage is inconsequential, the covenant does not become operative. It is the general rule that in determining the necessity of offset wells, due regard must be given to the interest of both parties considered in the light of all the facts and circumstances, such as the porosity of the sand, the probable extent of the drainage, the productivity of the well to be offset, the cost of drilling, and the probability of securing a paying well. Lawrence Oil Corporation v. Metcalfe, supra; Central Kentucky Natural Gas Co. v. Williams, 249 Ky. 242, 243, 60 S. W. (2d) 580. The lessee must act in good faith and as an ordinarily prudent operator would act under the same or similar circumstances, but his judgment is entitled to and will be given great weight and consideration. Willis' Thornton on Oil and Gas, secs. 154, 157, 167, and 173; Austin v. Ohio Fuel Oil Co., 218 Ky. 310, 291 S. W. 386.

The lessee in the instant case has gone to great expense in the development of appellants' property, and has drilled three wells near adjoining property lines and at locations where the evidence shows it was most likely that oil would be found. It is improbable that these wells will produce sufficient oil to pay the cost of drilling, and it would be unfair to the lessee to forfeit his lease, or any part thereof, unless the appellants have shown that a substantial amount of oil is being drained from their property by wells on adjoining land, or that it is reasonably probable that a paying well can be drilled at another location. This they have failed to do. They likewise failed to show that water was permitted to enter the oil sand under their land through any negligence on the part of appellees.

No cause having been shown for forfeiting the undeveloped portion of the leasehold, the judgment is affirmed.