**GREGORY et al. v. SOHIO PETROLEUM CO. et al.**

Court of Appeals of Kentucky.

May 22, 1953.

As Modified on Denial of Rehearing Nov. 13, 1953.

Thomas E. Sandidge, Owensboro, for appellants.

Thacker & Sweeney, Owensboro, Ortmeyer, Bamberger, Ortmeyer & Foreman, Evansville, Ind., for appellees.

MOREMEN, Justice.

Appellants sought in the circuit court to cancel an oil and gas lease on their farm of about 140 acres. The chancellor refused to order forfeiture of the lease and, from this judgment, this appeal is prosecuted.

Appellants, Beverly Gregory and Lucille Gregory, on March 15, 1946, executed an oil and gas lease to Sohio Petroleum Company for a definite period of three years and as long thereafter as gas or oil was produced in paying quantities. By assignments, Thomas M. Egan became the owner of a portion of the lease covering 70 acres. J. H. Gilliam became the owner of three-fourths interest in the portion that covered another 70 acre tract and Nash Redwine became the owner of the remaining one-fourth interest in said leasehold. All of the foregoing interests were held subject to a graduated overriding royalty interest reserved by the Sohio Petroleum Company in seven-eighths of the oil produced from the entire leasehold.

A few days before the expiration of the original term of the lease, the lessees commenced drilling and the well was completed about April 1, 1949. The initial production of this well was approximately 18 to 20 barrels of oil and 45 barrels of water per day but, within a few months, production declined to an average of 2 or 3 barrels of oil per day. This was the only well drilled.

About 15 months later, and on June 30, 1950, appellants addressed a letter to each of the appellees demanding that they continue the development of the leasehold and notified them that unless they commenced drilling a well on the undeveloped portion of their farm within 30 days, said lease would be cancelled and all the rights would be forfeited except as to the 10 acres which surrounded the producing well.

On September 18, 1950, appellants filed a petition in equity asking for cancellation of the lease except as to the 10 acre tract surrounding the producing well. A summons was served on the Sohio Petroleum Company, but a warning order was made for appellees, Thomas M. Egan and J. H. Gilliam, who were citizens of Evansville, Indiana, and appellee, Nash Redwine, who was a citizen of Mt. Vernon, Illinois. Sohio Petroleum Company filed a general demurrer and answer to the petition, but appellees, Egan, Gilliam and Redwine, did not enter their appearance to the action. At the February 1951 term of court, Sohio Petroleum Company, on its own motion, withdrew its general demurrer and answer from the record and, on February 7, 1951, because other appellees failed to appear or defend, the chancellor entered a judgment cancelling the lease except as to the 10 acre tract surrounding the well.

Thereafter, and on February 15, 1951, appellants executed a new oil and gas lease on their farm on all land, except the 10 acre tract, to John P. Anton who, in March of 1951, commenced drilling on said land and who has drilled several wells since then.

At the April, 1951 term of court, appellees, Egan, Gilliam and Redwine, under section 414 of the Kentucky Civil Code of Practice, filed a written motion to set aside the judgment of February 7, 1951, cancelling the old lease, asked for a retrial of the case, and tendered an answer to the petition which was later replaced by another answer.

In the first paragraph of the answer, appellees admitted the truth of certain allegations contained in the petition. In the second paragraph, appellees set out that the drilling operation which resulted in the producing well on the property cost approximately $10,747, and they had received from the sale of oil from said well the sum of $4,662. They further alleged that the Ohio Oil Company had drilled a well on lands adjoining appellants' property on the west and neither oil nor gas was found in commercial quantities; that wells had been drilled on land adjoining appellants' on the east and no gas or oil was discovered; that no wells had been drilled to the north or south of appellants' land which would require offset wells and that a geological study revealed there was no drainage of oil and gas from and through the lands of appellants. They further alleged that they had complied in good faith and with reasonable diligence to the implied obligation to develop the property, that appellees were entitled to operate the lease as a whole and

that, under present conditions, no reasonably prudent operator would feel justified in drilling additional wells on appellants' property. In the third paragraph of the answer, appellees stated that if they were incorrect in their views, the mistake resulted from an honest difference of judgment between the appellants and appellees in which event the court should not declare the lease or any part thereof forfeited, but should define the rights of the parties and determine what wells, if any, should be drilled and give appellees an opportunity to comply with the order of the court.

At the June term of court, the motion to set aside the judgment was sustained and a retrial was had. At its conclusion the court entered a judgment in which it set aside its prior judgment of February 7, 1951, and ordered appellees to begin the drilling of a well within 90 days after final determination of the case by the court.

Appellants contend that the appellees did not present a valid defense to appellants' petition, argue that appellees were guilty of unreasonable delay in the development of the property, and insist that the mere fact appellees did not deem the property to be potentially productive or did not desire to spend money at that time on its development is no excuse for their failure further to develop the property. They contend that the appellees were holding it purely for speculative purposes.

We have held in numerous cases that a lessee will not be permitted to hold the land for speculative or other purposes for an unreasonable length of time. Monarch Oil, Gas & Coal Co. v. Richardson, 124 Ky. 502, 99 S.W. 668; Soaper v. King, 167 Ky. 121, 180 S.W. 46; Dinsmoor v. Combs, 177 Ky. 740, 198 S.W. 58; Hughes v. Bussville Oil & Gas Co., 180 Ky. 545, 203 S.W. 515; Reynolds v. White Plains Oil & Gas Co., 199 Ky. 243, 250 S.W. 973; Warfield Natural Gas Co. v. Allen, 248 Ky. 646, 59 S.W.2d 534, 91 A.L.R. 890.

■ We have also held that inasmuch as the lessee incurs all the financial hazards

in connection with the drilling of a well under a lease of this type, the true test of proper action of the lessee is not to be found either in the extravagant expectations of the lessor or the unreasonable timidity of the lessee. In American Wholesale Corporation v. F. & S. Oil & Gas Co., 242 Ky. 356, 46 S.W.2d 498, 501, we said:

"The lessees were not the arbiters of the extent to which, or the diligence with which, the operations thereunder shall proceed; but both the lessors and the lessees were bound by the standard of what, in the circumstances, would be reasonably expected of an operator of ordinary prudence, having due regard to the interest of both."

With this criteria in mind, it is necessary to examine the proof that was introduced in behalf of appellees. Appellants offered no testimony.

It was shown that the cost of drilling and completing the original well, which, after a very short time, was producing only 2 to 3 barrels of oil a day, was $10,747, and that as late as April 1951, the lessees had received from the sale of oil the sum of $4,662 from which also must be subtracted the operational costs of the well. In addition, it was shown that other wells drilled on adjoining land were dry and that the leased property was surrounded on three sides by 14 dry holes. As we have remarked, the proof also showed that there was no drainage of oil or gas from the leased property. Gilliam, who seemed to be the chief operator, testified that at the time he received the letter directing them to proceed, he explained to appellants that the well was not producing enough oil, winter was coming on, which would hamper their operations, and he did not feel justified in drilling at that time, but later would reconsider the matter and perhaps drill another well. He explained his position as follows:

"Q. Geologically speaking, Mr. Gilliam, state whether there was anything that should have or would have led you to have reason to believe that the

Gregory lease did not warrant further development in June, 1950? A. Two things could be given as reasons why additional wells should not be drilled in this area. One is structure and the other is the sand condition. In Palestine sand lithographical sand bars or beds may appear or disappear from one location to another with or without the influence of structure. In contemplating an area for further drilling an operator as a rule tries to use all information available—from the standpoint of lithography, sand conditions and the presence of existing wells and well logs. In our immediate position we felt that further development on the Gregory farm was impossible at this time. In checking our well log for encouragement, as I outlined before, we had nothing but dry holes immediately surrounding the Gregory land on all sides. As stated before these same conditions existed when drilling of the Gregory No. 1, which brought us only 18 to 20 barrels of oil and a large quantity of water and as is sometimes the case an offset to this well could have brought even more water and be even more worthless. The only reason, in my opinion, a man would drill additional wells under the conditions we faced at that time, would be if he could drill the wells with somebody else's money at no expense to himself and getting a free override, as no prudent operator, in my opinion, would have wanted to offset this well. There was nothing to encourage our drilling another well on the lease."

■ In Hughes v. Busseyville Oil & Gas Co., 180 Ky. 545, 203 S.W. 515, a case similar in fact to this one, we held that the facts shown were sufficient to prove the land was not being held for speculative purposes and without intention of developing it in the near future. We believe appellants' action in sending the letter of June 30, 1950, was precipitate and the chancellor properly refused to cancel the lease.

■ Appellants next contend that because they executed a new lease on the property to John P. Anton prior to the time any steps were taken under section 414 of the Civil Code of Practice to set aside the default judgment, his title to the new lease was unaffected by the new trial because he was a bona fide purchaser of the new lease, and invoke the aid of section 417 of the Civil Code of Practice, which reads as follows:

"The title of purchasers in good faith to any property sold under an attachment or judgment shall not be affected by the new trial permitted by section 414, except the title of property obtained by the plaintiff and not bought of him in good faith by others."

Appellants rely upon Kellar v. Stanley, 86 Ky. 240, 5 S.W. 477, and Underwood v. Cunningham, 307 Ky. 109, 209 S.W.2d 853, to support their contention, but both these cases involved actual decretal sales. It may be noted that section 417 limits its application to purchasers of property sold under an attachment or judgment. We are of opinion this section applies only to juridical sales, and no such sale was had here. This determination is only as it may affect any conflict of interest between the appellants and appellees herein since Anton is not a party.

Finally, appellants argue that the court now has in effect two judgments, one of which declares the interest of Sohio Petroleum Company cancelled, and the other adjudges the lease to be valid insofar as it affects Egan, Gilliam and Redwine. We have before us only the appeal from the judgment that affects Egan, Gilliam and Redwine. We will confine our opinion in this decision to that judgment and will not undertake to construe the validity of a judgment that is not before us.

Judgment affirmed.